UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

ALLEN RAY,

                    Plaintiff,

      v.

COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION,

              Defendant.

3:11-cv-0069 -ST

FINDINGS AND
RECOMMENDATION

STEWART, Magistrate Judge:

## **INTRODUCTION**

      Plaintiff, Allen Ray ("Ray"), seeks judicial review of the final decision by the Social

Security Commissioner ("Commissioner") denying his applications for Disability Insurance

Benefits ("DIB") under Title II of the Social Security Act ("SSA"), 42 USC §§ 401-433,

and Supplemental Security Income ("SSI") under Title XVI of the SSA, 42 USC §§ 1381-

1383f. This court has jurisdiction to review the Commissioner's decision pursuant to

42 USC § 405(g) and § 1383(c)(3). For the reasons set forth below, that decision should be

REVERSED and REMANDED for an award of benefits.

## ADMINISTRATIVE HISTORY

Ray protectively filed for both DBI and SSI on January 24, 2006, alleging a disability onset date of June 16, 2003.  Tr. 102-07.[1]  His applications were denied initially and on reconsideration.  Tr. 76-90, 94-99.  On December 1, 2008, a hearing was held before Administrative Law Judge ("ALJ") Donna Montano.  Tr. 21.  The ALJ issued a decision on May 28, 2009, finding Ray not disabled.  Tr. 22-52.  The Appeals Council denied a request for review on January 4, 2011.  Tr. 1-3.  Therefore, the ALJ's decision is the Commissioner's final decision subject to review by this court.  20 CFR § 410.670a.

## BACKGROUND

Born in 1966, Ray was 42 years old at the time of the hearing before the ALJ. Tr. 29.  He has a limited education and past relevant work experience as warehouse worker and cleaner, furniture mover, gas station attendant, and janitor.  Tr. 19, 140, 173-77.  Ray alleges that he is unable to work due to the combined impairments of chronic pain syndrome, failed back surgery, degenerative disc disease, radiculopathy with motor deficits and sensory loss, sciatica, hyperlipidemia, hypertension, chronic obstructive pulmonary disease ("COPD"), asthma, numbness and dizziness.  Tr. 29, 139, 188.

### I.    Medical Records

Ray received intermittent treatment at the Swedish Medical Center in Seattle, Washington, from October 2002 through August 10, 2005.  Tr. 299-331.  Chronic lung wheezing and fluid in the chest were noted by the treating physician on March 6, 2003. Tr. 320-22.  On June 12, 2003, Ray suffered acute lower back pain and was diagnosed with right sciatica with lower lumbar spasms.  Tr. 315-17.  On June 26, 2003, Ray presented

---

[1]  Citations are to the page(s) indicated in the official transcript of the record filed on June 1, 2011 (docket # 10).

again with "acute and chronic pain" and was instructed to follow up with his "neurosurgeon ASAP." Tr. 306. An MRI on July 5, 2003, showed a slight disc protrusion at the L4-5 level and L5-S1 without neural foraminal narrowing or nerve impingement. Tr. 289. On August 9, 2003, Ray was treated for intoxication and described as "homeless, disheveled, dirty" and complaining of right-sided back and leg pain. Tr. 300-04.

On August 13, 2003, Ray sought treatment at the University of Washington Medical Center in Seattle, reporting pain that made him "completely unable to walk" and several episodes of falling. Tr. 289. The EMG and SEP findings of L5 radiculopathy were consistent with the physical exam. *Id.* At that time, he received an L5 nerve root steroid injection. Tr. 291-92.

Ray apparently moved to Portland, Oregon, and received ongoing treatment at Multnomah County (Westside) Health Department ("Multnomah County Clinic") from December 20, 2003, through August 2, 2006, with Debra Heybach, a Family Nurse Practitioner ("FNP"). Tr. 344-401, 466-533.

At various hospital emergency rooms ("ER") in Portland, he was treated for a fractured shoulder in December 2003 and fractured ribs in January 2004, due to falling as a result of pain and balance problems related to the nerve damage in his spine. Tr. 525, 528. At another hospital ER visit on April 15, 2004, he explained that he drank all day to treat his back pain. Tr. 450.

On June 8, 2005, while living in a tent outside, he was treated at the Multnomah County Clinic for numbness, right leg and back pain. Tr. 489. At that time, he denied that alcohol negatively impacted his life, but admitted using it for pain control in the past. *Id.* On June 11, 2005, Ray was treated at a hospital ER for "chronic sciatic pain, acute

exacerbation, numbness." Tr. 294-98. He was diagnosed with "chronic right sided sciatica with sensory loss and motor deficit" and ordered to ice intermittently and daily, limit his lifting, and not engage in strenuous activity. Tr. 294. He was also advised to obtain a lower bunk at the shelter and prescribed Vicodin. *Id.* In July 2005, after obtaining subsidized housing, he was treated at the Multnomah County Clinic for sciatic nerve pain and numbness in his foot. Tr. 354. In September 2005, he was treated at a hospital ER for abdominal pain and diagnosed with internal hemorrhoids and gastritis. Tr. 510-12.

In January 2006, Ray reported to the clinic that he was not able to work consistently doing manual labor due to his back pain and complained of COPD, asthma, sciatic nerve pain, and right leg and knee pain. Tr. 478, 481. An MRI on January 24, 2006, showed degenerative changes and specifically "L5-S1: Asymmetrical disc bulging to the left with effacement of fat anterior to the exiting nerve root on the left side. It appears that there is a slight posterior displacement of this root." Tr. 575. At that time, Ray was encouraged to work with vocational rehabilitation to get a less physical job. Tr. 478.

In February 2006, he was again treated at the clinic for COPD, hypertension, back pain and chest wall pain. Tr. 475. As a result of wheezing, shortness of breath, and sharp chest pains, Ray underwent pulmonary function tests in March 2006 at the Oregon Clinic which revealed lung defects and confirmed the diagnosis of COPD. Tr. 335-43. FNP Heybach recommended in March 2006 that he try to quit smoking. Tr. 474.

In June 2006, FNP Heybach diagnosed Ray with "nerve compression" and radiculopathy and observed him "ambulating [with] limp." Tr. 470.

DDS physician Martin Kehrli, M.D., completed a Physical Residual Functional Capacity Assessment, dated June 15, 2006. Tr. 402-09. He opined that Ray was limited as

follows: "Unable to lift more than 10 [pounds], squat, bend or reach due to increase[d] pain. Walk only 4-5 blocks [total], sit 2 hours. Can walk 4-5 steps then needs to stop due to balance problem. When in pain irritable. Poor response to stress. Subjective reporting is partial[ly] consistent w/objective findings." Tr. 407. This assessment would permit Ray to perform light work. Tr. 409.

In July 2006, FNP Heybach assessed Ray with a global assessment of functioning score ("GAF") of 50[2] and again treated him for "chronic sciatic pain." Tr. 467. In August 2006 Ray visited a hospital ER to evaluate his lower back pain, explaining that though he had a prescription for Vicodin, he decided not to fill it because he was trying to wean himself off the medication. Tr. 438. He had a strong smell of alcohol on his breath and admitted to drinking two alcoholic beverages earlier. *Id.*

In a September 2006 letter addressed "To Whom it May Concern," FNP Heybach stated that:

> [Ray] suffers from severe degenerative changes of his lumbar spine
> with a bulging disc of L5-S1. He has had previous back surgery
> without resolution of pain. He has tried multiple times to work but has
> been unable to sustain employment secondary to back pain and
> decreased mobility. [Ray] is unable to work at any capacity due to the
> chronic severity of his back disease which will be ongoing.

Tr. 549.

She also completed a questionnaire regarding Ray's limitations on October 10, 2006, at the request of his attorney. Tr. 551-57. She noted a diagnosis of lumbar radiculopathy with a poor prognosis, listed symptoms of chronic back pain and difficulty walking due to

---

[2] The GAF is a scale used by clinicians to determine the individual's current overall functioning. A GAF of 41-50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). The American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed. 2000).

nerve impingement, and cited the 2006 MRI as objective support.   Tr. 551.   She opined that

multiple pain medications and muscle relaxants "all cause depression of [the] central

nervous system and impairs judgment and motor skills."  *Id*.  She stated that Ray's

impairments require a change of "position or posture more than once every two hours" and

interfere "very seriously with [his] ability to independently initiate, sustain, or complete

normal activities of daily living," due to "significant and persistent disorganization of motor

function in two extremities, resulting in sustained disturbance of gross and dexterous

movements, or gain and station."  Tr. 553.  In an eight-hour work day, she limited Ray to

standing and walking less than two hours and sitting less than two hours.  Tr. 554.  Before

requiring position changes, she noted that Ray can only sit or stand 15 minutes, must walk

around every 15 minutes for 10 minutes each time, and needs the opportunity to shift

position at will and lie down at unpredictable intervals.  *Id*.  With respect to postural

activities, he can never stoop, bend, or, climb, can rarely twist and crouch, can occasionally

climb stairs, cannot do any repeated movements with his upper body, and can only rarely lift

items weighing less than 10 pounds.  Tr. 555.  As to environmental restrictions, he must

avoid fumes, odors, gases, poor ventilation, and hazards.  Tr. 556.  On average, she

anticipated that Ray would be absent from work more than four times per month due to his

impairments or treatment.  *Id.*

On November 16, 2006, DDS physician Linda Jensen, M.D., reviewed Ray's medical

records and concluded that he could perform light work "with postural limitations and no

concentrated exposure to hazards."  Tr. 569.

Ray continued to visit the Multnomah County Clinic to treat his back pain and

respiratory problems.  In 2007 and 2008, he was prescribed Oxycodone for his pain on a

monthly basis and an inhaler for his persistent, moderate asthma.  Tr. 609-20, 697-708.

During this period, FNP Heybach noted that he used a cane and was in pain.  Tr. 705

(10/25/07), 697 (9/2/08).

After the December 2008 hearing, at the request of the ALJ, Tatsuro Ogisu, M.D.,

attempted to schedule a consultative examination with Ray.  His office made several

attempts from January 16 through 27, 2009, but was unable to reach Ray. Tr. 713-19.

On June 11, 2009, FNP Heybach wrote another letter "To Whom It May Concern"

stating that Ray had been under her care since January 2004 for multiple medical problems,

including "chronic pain and nerve root compression [a]ffecting his back and right leg."

Tr. 726.  She diagnosed chronic sciatica, as verified by the January 2006 and June 2009

MRI findings which she deemed to be consistent with his symptoms.[3]  *Id.*  She opined that

Ray has difficulty "walking, standing, or, sitting for any period over 15 minutes" due to

"chronic pain in his back radiating down his right leg with numbness and tingling."  *Id.*  She

added that Ray "has been cooperative and compliant with his health care," yet the "severe

impairment in his mobility combined with his other medical problems makes him unable to

work in any capacity."  *Id.*

## II.    <u>Ray's Testimony</u>

Ray testified that in 2003, pain suddenly struck his "right side all the way down."

Tr. 51.  Unable to work, he went back to his tent outside where he was living and lay there

for two days before going to the hospital.  *Id.*

---

[3]  The official transcript does not contain a 2009 MRI.  FNP Heybach also states that Ray "had back surgery
in the past which was unsuccessful at University of Washington." This is consistent with Ray's report of
having a "failed" surgery at some unspecified date in the past.  Tr. 551.  Since the official transcript does not
contain a medical record of that surgery, Ray and FNP Heybach likely were referring to the 2003 steroid
injection.

Ray continued working intermittently for the next couple years with the pain until he could no longer perform his job.  Tr. 57.  He testified that he would work one or two days per week since "one day's work would put [him] down three days at a time, or maybe five." *Id.*  He reportedly was instructed by his primary treatment provider to stop working due to his progressive chronic health problems.  Tr. 32, 57.  The decision to stop working was a very difficult for him.  Tr. 32.

Since 2005, he has required assistance in daily living.  Tr. 32.  About two days per week, the pain is so severe he cannot go from his chair to the bathroom.  Tr. 59.  He explained, "I could be standing up doing dishes, and five minutes into doing the dishes, my back will all of a sudden give [out] on me  and I'll have to sit down."  Tr. 32.  He also requires a "two wheel cart" to grocery shop once or twice a week, and "friends come with [him] and help [him] carry the food back."  Tr. 33, 35.  He resides in one room in a facility for disabled people.  Tr. 34.  He does not drive, does not cook beyond using the microwave on occasion, and cannot walk more than three blocks.  Tr. 34. 36.  He no longer participates in a social life, sports, hobbies, or crafts and has only "a few friends that come over" who see and help him.  Tr. 37.  He was told not to lift more than 25 pounds.  Tr. 39.

Ray spends most his days lying in a recliner chair with his legs elevated to heart level to release pressure from the spine.  Tr. 62.  On a good day, he can tolerate sitting for two hours, walking for ten minutes, and standing 30 minutes at a time, but at least two days per week he cannot get out of his recliner.  Tr. 39, 64-65.  Despite trying various medications over the years, he suffers from chronic, progressive pain and on occasion uses alcohol to "self medicat[e]."  Tr. 42-43.

Ray also has numbness in his arms, hands, and feet.  Tr. 43, 54.  Since 2002, he has

been unable to feel his toes and, as a result, has a tendency to fall, leading to further

injuries.  Tr. 33, 40.  In 2006, he twisted his ankle, and the hospital prescribed a cane which

he uses to ambulate.  Tr. 56.  He must "avoid anything that [he] ha[s] to climb, such as

ramps or stairs" due to his tendency to fall.  Tr. 40, 61.  He also makes an effort not to pick

up objects from the floor, since stooping and bending at the waist are physically impossible

for him to do.  Tr. 40, 62-63.

He takes prednisone for his COPD.  Tr. 44.  His COPD has required multiple

hospitalizations, as recently as two months before the hearing, and used of a nebulizer

machine at the hospital every couple of months.  Tr. 44, 52.  He suffers shortness of breath

daily and requires the use of inhalers for asthma.  Tr. 52.  He suffers dizziness one to two

days a month and takes medication for hypertension. Tr. 54.  He has anger and irritability

problems about two days per week which prevent him from being around people.  Tr. 55.

III.    <u>**Lay Witness Testimony**</u>

David Michael Schlimwine ("Schlimwine") testified that he has known Ray about seven

seven years and sees him three to five days per week.  Tr. 68.  He has observed Ray's

difficulty walking with a limp, using a cane, and moving slowly.  Tr. 66-67.  Though he has

observed Ray drink several times a week, he did not believe this impacted Ray's pace.

Tr. 69.  Ray can walk about two blocks but has to stop to rest due to pain.  Tr. 67.  He also

is in pain when standing after ten minutes and must sit and rest for 45 minutes before

getting up again.  Tr. 67-68.

Wayne Elliot Gladden ("Gladden") also testified.  He has known Ray about six

years, seeing him daily until he moved and now sees him about twice weekly.  Tr. 71.

Gladden described Ray as "limping" and unable to walk more than about three blocks.
Tr. 71.  Gladden can tell when Ray is in pain by his "grimaces" when he will "stop the
conversation and kind of clinch up."  Tr. 71-72.  Ray functions at 30% and is "worn out" by
walking. Tr. 72.  Gladden also noted Ray's irritability on a regular basis when he raises his
voice and uses vulgarities, subsequently causing him to avoid people.  Tr. 73.

**IV.    Vocational Expert Testimony**

    The ALJ asked the vocational expert ("VE") if an hypothetical individual with
restrictions of modified light work, postural restrictions of occasional bending or stooping
and environmental restrictions of avoiding concentrated exposure of hazards such as dust or
fumes would be able to perform Ray's past relevant work.  Tr. 47.  The VE explained that
while the individual could not perform past work, he could perform two jobs at the "full
range of light" work, namely small products assembly (DOT 739.687-030) and cannery
worker (DOT 529.686-014).  Tr. 48.

    When asked by Ray's attorney to consider a hypothetical claimant with limitations
consistent with those presented by FNP Heybach's RFC, the VE ruled out competitive
employment.  Tr. 49-50, 550-58.

**DISABILITY ANALYSIS**

    Disability is the "inability to engage in any substantial gainful activity by reason of
any medically determinable physical or mental impairment which can be expected to result
in death or which has lasted or can be expected to last for a continuous period of not less
than 12 months[.]"  42 USC § 423(d)(1)(A).  The ALJ engages in a five-step sequential
inquiry to determine whether a claimant is disabled within the meaning of the Act.  20 CFR
§§ 404.1520, 416.920; *Tackett v. Apfel*, 180 F3d 1094, 1098-99 (9th Cir 1999).

At step one, the ALJ determines if the claimant is performing substantial gainful activity.  If so, the claimant is not disabled.  20 CFR §§ 404.1520(a)(4)(i) & (b), 416.920(a)(4)(i) & (b).

At step two, the ALJ determines if the claimant has "a severe medically determinable physical or mental impairment" that meets the 12-month durational requirement.  20 CFR §§ 404.1520(a)(4)(ii) & (c), 416.909, 416.920(a)(4)(ii) & (c).  Absent a severe impairment, the claimant is not disabled.  *Id.*

At step three, the ALJ determines whether the severe impairment meets or equals an impairment "listed" in the regulations.  20 CFR §§ 404.1520(a)(4)(iii) & (d), 416.920(a)(4)(iii) & (d); 20 CFR Pt. 404, Subpt. P, App. 1 (Listing of Impairments).  If the impairment is determined to meet or equal a listed impairment, then the claimant is disabled.

If adjudication proceeds beyond step three, the ALJ must first evaluate medical and other relevant evidence in assessing the claimant's residual functional capacity ("RFC").  The claimant's RFC is an assessment of work-related activities the claimant may still perform on a regular and continuing basis, despite the limitations imposed by his or her impairments.  20 CFR §§ 404.1520(e), 416.920(e); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 (July 2, 1996).

At step four, the ALJ uses the RFC to determine if the claimant can perform past relevant work.  20 CFR §§ 404.1520(a)(4)(iv) & (e), 416.920(a)(4)(iv) & (e).  If the claimant cannot perform past relevant work, then at step five, the ALJ must determine if the claimant can perform other work in the national economy.  *Yuckert*, 482 US at 142; *Tackett*

*v. Apfel*, 180 F3d 1094, 1099 (9th Cir 1999); 20 CFR §§ 404.1520(a)(4)(v) & (g), 416.920(a)(4)(v) & (g).

The initial burden of establishing disability rests upon the claimant. *Tackett*, 180 F3d at 1098. If the process reaches step five, the burden shifts to the Commissioner to show that jobs exist in the national economy within the claimant's RFC. *Id*. If the Commissioner meets this burden, then the claimant is not disabled. 20 CFR §§ 404.1520(a)(4)(v) & (g), 416.920(a)(4)(v) & (g), 416.960(c).

## ALJ'S FINDINGS

At step one, the ALJ concluded that Ray has not engaged in substantial gainful activity since June 16, 2003, the alleged onset date. Tr. 13.

At step two, the ALJ determined that Ray has the severe impairments of degenerative disc disease of the lumbar spine and asthma/COPD. *Id.*

At step three, the ALJ concluded that Ray does not have an impairment or combination of impairments that meets or equals any of the listed impairments. Tr. 15. The ALJ found that Ray has the RFC to perform light work, except he can occasionally bend, stoop, and perform other postural activities and needs to avoid concentrated exposure to hazards, dusts, fumes, etc. *Id.*

Based upon the testimony of the VE, the ALJ determined at step four that Ray's RFC precluded him from returning to his past relevant work. Tr. 19.

At step five, the ALJ found that considering Ray's age, education, and RFC, he was capable of performing the jobs of assembler, small products II, and cannery worker. Tr. 20-21.

Accordingly, the ALJ determined that Ray was not disabled at any time through the date of the decision.

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record. 42 USC § 405(g); *Lewis v. Astrue*, 498 F3d 909, 911 (9th Cir 2007). This court must weigh the evidence that supports and detracts from the ALJ's conclusion. *Lingenfelter*, 504 F3d 1028, 1035 (9th Cir 2007), citing *Reddick v. Chater*, 157 F3d 715, 720 (9th Cir 1998). The reviewing court may not substitute its judgment for that of the Commissioner. *Ryan v. Comm'r of Soc. Sec. Admin.*, 528 F3d 1194, 1205 (9th Cir 2008), citing *Parra v. Astrue*, 481 F3d 742, 746 (9th Cir 2007); *see also Edlund v. Massanari*, 253 F3d 1152, 1156 (9th Cir 2001). Where the evidence is susceptible to more than one rational interpretation, the Commissioner's decision must be upheld if it is "'supported by inferences reasonably drawn from the record.'" *Tommasetti v. Astrue*, 533 F3d 1035, 1038 (9th Cir 2008), *quoting Batson v. Comm'r of Soc. Sec. Admin.*, 359 F3d 1190, 1193 (9th Cir 2004); *see also Lingenfelter*, 504 F3d at 1035.

## FINDINGS

Ray claims that the ALJ erred by: (1) improperly rejecting FNP Heybach's opinion; (2) improperly discrediting the lay witness testimony; (3) improperly assessing his credibility; (4) failing to fully develop the record; and (5) failing to obtain a medical expert opinion. As a result, he argues that the ALJ's RFC does not accurately reflect his functional limitations.

///

13 - FINDINGS AND RECOMMENDATION

I.      **FNP Heybach's Opinion**

The ALJ accorded "little weight" to FNP Heybach's opinion that Ray was unable to perform even sedentary work.  Tr. 18-19.  In support, she first noted that such a limited level of functioning was "inconsistent with examination findings" and specifically referenced "multiple medical records" that Ray "was able to move without apparent difficulty, that he had a normal gait, and that he did not exhibit motor or sensory deficits." Tr. 18, 438-39, 444, 450.  She further referenced "only mild obstructive ventilator defect" in pulmonary function test results and "no evidence of recurring hospitalizations for respiratory difficulties."  Tr.19.  Second, she found that FNP Heybach's opinion was "inconsistent with [Ray's] daily functioning and other reported activities."  *Id.*  Additionally she noted that Ray's "ability to work is an issue reserved to the Commissioner."  *Id.*

A.      **Controlling Weight**

Ray first argues that since FNP Heybach is a treating source, the ALJ erred by failing to give her opinion controlling weight.

The SSA regulations distinguish between opinions from "acceptable medical sources" and from "other sources."  20 CFR §§ 404.1513(a) and (e), 416.913(a) and (e). They also set forth guidelines to follow when weighing conflicting opinions from acceptable medical sources, 20 CFR §§ 404.1527 and 416.927, but not when weighing opinions from other sources.  As a result, the ALJ may accord less weight to opinions from "other sources" than opinions from "acceptable medical sources."

The SSA regulations define "controlling weight" as the weight given to a medical opinion from a treating source that must be adopted.  SSR 96-2p, 1996 WL 374188 (July 2, 1996), at *2, citing 20 CFR §§ 404.1527(d)(2) & 416.927(d)(2).  A medical opinion from a

treating source is given controlling weight only if it "is 'well-supported' by 'medically acceptable' clinical and laboratory diagnostic techniques" and is "'not inconsistent' with the other 'substantial evidence' in the individual's case record." *Id.* "It is an error to give any opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with the other substantial evidence in the case record." *Id.* Whether medical evidence is well-supported is a fact-specific inquiry for the ALJ to make based on the extent to which the record supports the evidence. *Id.* Substantial evidence is that which "a reasonable mind would accept as adequate to support a conclusion that is contrary to the conclusion expressed in the medical opinion." *Id* at *3.

Acceptable medical sources specifically include licensed physicians and licensed psychologists, but not nurse practitioners. 20 CFR §§ 404.1513(a)(1) & (3), 416.913(a)(1) & (3). However, "a nurse practitioner working in conjunction with a physician constitutes an acceptable medical source, while a nurse practitioner working on his or her own does not." *Gomez v. Chater*, 74 F3d 967, 971 (9th Cir), *cert denied*, 519 US 881 (1996); *accord Jerry v. Comm'r of Soc. Sec. Admin.*, 97 F Supp2d 1219, 1221 (D Or 2000).

FNP Heybach was Ray's primary care provider at the Multnomah County Clinic. Tr. 335-401, 465-558, 595-97, 602-709, 720-726. As a result, Ray argues that she is an acceptable medical source. Presumably FNP Heybach was not working on her own at the clinic, but worked in conjunction with one or more physicians. However, the medical records do not reveal that she consulted with physicians regarding Ray's treatment or whether physicians reviewed and approved her evaluations. Therefore, this court has

insufficient information to conclude that FNP Heybach is an acceptable medical source for the purpose of Ray's treatment.

However, as the Commissioner concedes, the ALJ weighed the opinion of FNP Heybach as if she were an acceptable medical source. Thus, the issue is whether the ALJ erred by rejecting FNP Heybach's opinion and instead giving "significant weight" to the contrary opinions of Drs. Kehrli and Jensen.

### B.    <u>Analysis of Reasons</u>

The weight given to the opinion of a physician depends on whether it is from a treating physician, an examining physician, or a nonexamining physician. More weight is given to the opinion of a treating physician who has a greater opportunity to know and observe the patient as an individual. *Orn v. Astrue*, 495 F3d 625, 632 (9th Cir 2007). If a treating or examining physician's opinion is not contradicted by another physician, the ALJ may only reject it for clear and convincing reasons. *Id*; *Widmark v. Barnhart*, 454 F3d 1063, 1067 (9th Cir 2006). Even if the opinion is contradicted by another physician, the ALJ may not reject it without providing specific and legitimate reasons supported by substantial evidence in the record. *Orn*, 495 F3d at 632; *Widmark*, 454 F3d at 1066; *see also Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F3d 595, 600 (9th Cir 1999).

The opinion of a nonexamining physician, by itself, is insufficient to constitute substantial evidence to reject the opinion of a treating or examining physician. *Widmark*, 454 F3d at 1066 n2. However, it may serve as substantial evidence when it is supported by and consistent with other evidence in the record. *Morgan*, 169 F3d at 600.

Because FNP Heybach was a treating source whose opinion was contradicted by other physicians, the ALJ could reject her opinion only by providing specific legitimate

reasons based on substantial evidence in the record.  The ALJ gave more weight to the opinions of nonexamining physicians, Drs. Kehrli and Jensen, because they "are supported by the medical evidence of record, including imaging and examination findings discussed above, as well as, [Ray's] daily functioning and other reported activities."  Tr. 18; *also see* 402-09, 569.

The ALJ properly rejected FNP Heybach's conclusory opinion that Ray is unable to work.  Opinions by treating sources that an applicant is "disabled" or "unable to work" are not medical opinions, "but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability."  20 CFR §§  404.1527(e)(1), 416.927(e)(1). The Ninth Circuit has recognized that "the opinion of the treating physician is not necessarily conclusive as to either the physical condition or the ultimate issue of disability." *Thomas v. Barnhart*, 278 F3d 947, 956 (9th Cir 2002), citing *Morgan*, 169 F3d at 600.

However, FNP Heybach also opined that due to chronic sciatica (Tr. 551) or lumbar radiculopathy (Tr. 726), Ray suffers from a number of specific physical limitations.  While the ALJ did incorporate some of those limitations in the RFC, such as rarely crouching, occasionally climbing stairs, never climbing ladders, and an environmental restriction, she did not incorporate all of them or did so only to a lesser extent.  The issue is whether substantial evidence in the record supports the ALJ's rejection of FNP Heybach's other limitations because they are "inconsistent with examination findings" in the medical records and with Ray's "daily functioning and other reported activities."

17 - FINDINGS AND RECOMMENDATION

With respect to examination findings, the ALJ cited several hospital records.[4]  A close look at these records, however, does not support the ALJ's conclusion that Ray could "move without apparent difficulty," "had a normal gait," and "did not exhibit motor or sensory deficits."  Tr. 18.

On April 15, 2004, Ray presented to the ER at Providence Portland Medical Center for back pain after self-medicating with alcohol.  Tr. 450-51.  The chart note states that he "was able to roll onto a stretcher without apparent difficulty, and his gait was within normal limits" and "upon discharge he did wake with minimal stimulation and was able to walk without difficulty."  Tr. 450-51.  These cursory observations were not based upon an examination of his lower back.

Ray presented again to the Providence ER on June 8, 2004, with numbness in the right leg and severe low back pain.  Tr. 444.  That record states that his "motor is intact. Sensation is intact except right leg has numbness which is chronic. DTRs are 1+ symmetric. The patient is able to ambulate."  *Id.*  He was prescribed Vicodin*. Id.*  In June 2005, Ray presented to the Emanuel Hospital ER again complaining of back pain.  Tr. 294.  He was assessed with "muscle spasm of lower back.  Soft tissue tenderness of the right lower back and SI joint extending to buttocks.  Limited ROM of the lower back.  Positive straight leg test of the right side."  *Id.*  Again he was prescribed Vicodin.  *Id.*

On September 11, 2005, Ray visited the Legacy Good Samaritan ER for abdominal pain.  Tr. 51.  He showed normal range of movement in extremities, but was not examined for low back pain.

---

[4]  The ALJ's citation to various exhibits corresponds to the record as follows: Exhibits 11F.7-8 (Tr. 438-39) (8/1/06), 19 (Tr. 450) (4/15/04), 13 (Tr. 444) (6/8/04), 2F.2 (Tr. 294) (6/20/05), 12F.47 (Tr. 511) (9/11/05), and 8F (Tr. 412-13) (6/21/06).

18 - FINDINGS AND RECOMMENDATION

On June 21, 2006, Ray visited the Providence St. Vincent ER complaining of back pain after running out of Vicodin.  Tr. 412.  Due to a burning sensation in his leg, it was too painful for him to dorsiflex his right foot.  Tr. 413.  Straight leg raise on the right at about 60 degrees also produced pain in the right leg.  *Id.*  The treatment provider concluded that "most likely this pain represents an acute flare of his chronic pain."  *Id.*  Upon discharge, after being prescribed Vicodin, Ray's condition was "good and ambulatory."  *Id.*

The last record is from August 1, 2006, when Ray again visited the Providence ER complaining of back pain.  Tr. 438-39.  The chart note states that he has a "slow but purposeful gait" with a "slight drag to his right leg."  *Id.*  The physical examination revealed "reproducible tenderness in the mid, lower lumbar, and sciatica region on the right hand side," but a "full range of motion of his right ankle, knee and hip."  Tr. 439.  Upon discharge, after being given Vicodin, he was ambulatory.  *Id*.

These records neither support nor contradict FNP Heybach's findings.  They all support Ray's complaints of severe back pain, but none contains a comprehensive discussion or assessment of Ray's mobility.  They fail to suggest that Ray exhibited no motor or sensory deficits or that he would have no difficulty moving while standing, bending, stooping, crouching or any other position using his lower back, as the ALJ states. At best, they merely indicate that, despite his back pain, Ray was able at least to ambulate during his brief visits to hospital ERs, but without indicating for how far or how long. Moreover, other medical records reveal that he ambulated with a limp (Tr. 470 (6/29/06)) and had an "antalgic gait[5] with a cane" (Tr. 697 (9/2/08).  Thus, this reason given by the ALJ to reject FNP Heybach's opinion is not supported by the record.

---

[5]  An antalgic gait is one that is assumed so as to lessen pain.

19 - FINDINGS AND RECOMMENDATION

The second reason given by the ALJ to accord "little weight" to FNP Heybach's opinion rests on its inconsistency with Ray's daily living activities. Although the ALJ did not identify those inconsistences, earlier in her decision she discussed them in connection with Ray's credibility. Tr. 17. As discussed below, these reasons are not sufficient to discredit Ray. Similarly, they are not sufficient to discredit FNP Heybach.

As Ray's primary medial provider, FNP Heybach treated Ray's pain symptoms and COPD for years and, thus, was in a much better position than the nonexamining physicians to ascertain his physical limitations. Thus, the ALJ erred by failing to give legitimate reasons to reject Ray's physical limitations as assessed by FNP Heybach.

## II.    <u>Lay Witness Testimony</u>

Two of Ray's friends (Schlimwine and Gladden) testified at the hearing, and three other witnesses submitted written statements. In his undated statement, Koddy Hart reported that he had known Ray for about a year and a half and had called the ambulance at least four times for Ray when he had breathing problems or back spasms. Tr. 253. He felt that Ray had reached a point in which he was unable to work. *Id.* In his November 24, 2008 statement, Russell Penner stated that he had known Ray for two and a half years. Tr. 271. He observed that Ray had been using his cane more frequently and noted his difficulties with standing, walking, and sitting for prolonged periods of time. Tr. 272. According to his November 25, 2008 statement, Matthew Bambus had known Ray for three years. Tr. 277. He observed that Ray moved slowly, used a cane and appeared to be in significant pain. Tr. 279.

The ALJ gave "less weight" to this lay witness testimony and statements, explaining:

> [w]hile these statements may reflect the personal observations of these
> lay witnesses, the medical evidence of record thoroughly discussed

> above does not substantiate allegations of more limiting symptoms. . . .
> Moreover, the claimant's daily functioning and other reported
> activities do not support finding a more restrictive residual functional
> capacity than for a limited range of light work, including the ability to
> perform postural activities occasionally.

Tr. 19.

Ray argues the ALJ erred by rejecting this testimony in its entirety.

An ALJ must give germane reasons for rejecting lay witness testimony. *Nguyen v. Chater*, 100 F3d 1462, 1467 (9th Cir 1996). A lay witness cannot establish a medical diagnosis, but may testify regarding a claimant's symptoms and activities of daily living. *Id.*

Lay witness testimony as to a claimant's symptoms or how an impairment affects his ability to work is competent evidence which the ALJ must take into account. *Id*; *see also Dodrill v. Shalala*, 12 F3d 915, 919 (9th Cir 1993). However, testimony about the causes of a claimant's medical problems, such as a serious mental impairment as the result of a stroke, is beyond the competence of a lay witness and is not competent evidence. *Vincent v. Heckler*, 739 F2d 1393, 1394-95 (9th Cir 1984). Inconsistency with medical evidence is a germane reason sufficient to discredit lay witness testimony. *Bayliss v. Barnhart*, 427 F3d 1211, 1218 (9th Cir 2005).

All of the lay witnesses described Ray's difficulty ambulating, pain, need for help with daily activities, and repeated visits to the ER because of his conditions. To conclude that these statements were contrary to medical evidence, the ALJ cites the same medical evidence used to reject FNP Heybach's opinion. However, as discussed above, that medical evidence is not inconsistent with FNP Heybach's opinion. Neither are these medical records

inconsistent with Ray's daily functioning and reported activities as discussed below.  Thus, the ALJ failed to give germane reasons to reject the lay witness testimony.

## III.    Ray's Credibility

The ALJ found that Ray's impairments could reasonably be expected to cause some of the symptoms, but that his "statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity."  Tr. 16.  As to his "back related symptoms," she found that "the objective medical evidence of record does not support the degree to which [Ray] alleges more limiting symptoms" and that "examination findings are inconsistent with allegations of more limiting symptoms."  *Id.*  Similarly, she found that the medical record did not support his "respiratory symptoms."  Tr. 17.  She also found his alleged symptoms inconsistent with his "daily functioning and other reported activities" and his performance of manual labor until December 2005, a full two years since his alleged June 2003 onset date."  Tr. 17-18.  Finally, she cited his "failure to follow medical advice and to adhere to prescribed treatment."  Tr. 18.  She noted that he continued to smoke despite medical advice and to consume alcohol and "failed to attend scheduled consultative examinations" which "put [his] motivation to cooperate into question."  *Id.*

Ray argues that the ALJ erred by finding him less than credible as to his symptoms.

### A.    Legal Standards

The ALJ must consider all symptoms and pain which can "reasonably be accepted as consistent with the objective medical evidence and other evidence."  20 CFR § 416.929(a).  Once a claimant shows an underlying impairment which may "reasonably be expected to produce pain or other symptoms alleged," absent a finding of malingering, the ALJ must provide "clear and

convincing" reasons for finding a claimant not credible. *Lingenfelter,* 504 F3d at 1036, citing *Smolen v. Chater*, 80 F3d 1273, 1281 (9th Cir 1996). The ALJ's credibility findings must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F3d 748, 750 (9th Cir 1995), citing *Bunnell v. Sullivan*, 947 F2d 341, 345-46 (9th 1991) (*en banc*). The ALJ may consider objective medical evidence and the claimant's treatment history, as well as the claimant's daily activities, work record, and observations of physicians and third parties with personal knowledge of the claimant's functional limitations. *Smolen*, 80 F3d at 1284. The ALJ may additionally employ ordinary techniques of credibility evaluation, such as weighing inconsistent statements regarding symptoms by the claimant. *Id.* The ALJ may not, however, make a negative credibility finding "solely because" the claimant's symptom testimony "is not substantiated affirmatively by objective medical evidence." *Robbins v. Soc. Sec. Admin.*, 466 F3d 880, 883 (9th Cir 2006).

There is no evidence that Ray is a malinger. In fact, FNP Heybach specifically found that he is not. Tr. 552. Accordingly, the ALJ must provide clear and convincing reasons for a negative credibility finding.

### B.    Analysis of Reasons

Some of these reasons cited by the ALJ to cast doubt on Ray's credibility are supported by the record. In particular, substantial evidence supports the ALJ's conclusion that the medical record does not support Ray's testimony that due to his COPD, he has required multiple hospitalizations and used a nebulizer machine at the hospital every couple of months. However, the remaining reasons are not clear and convincing.

Although the ALJ correctly noted Ray's continued smoking, she failed to acknowledge Ray's testimony that he did try to stop smoking, but was allergic to the blue in

the nicotine patch and could not stand the taste of the gum.  Tr. 38.  Thus, it is questionable whether his continued smoking was an intentional failure to follow medical advice. Similarly, the ALJ also correctly noted that Ray continued to consume alcohol against medical advice.  However, she failed to acknowledge the conclusion by one mental health evaluator in November 2006 that "[a]lcoholism is an issue but no indication that it is impacting function to a prominent degree."  Tr. 568.  Furthermore, it is apparent from the record that Ray used alcohol to self-medicate when he ran out of prescription pain medication.  Therefore, it is questionable whether his alcohol use supports the conclusion that he intentionally failed to follow medical advice.

As for failing to appear for the consultative examination, Ray argues that he was reportedly homeless during that period of time.  Although the record contains a few references to Ray being homeless (Tr. 44, 489, 495), it is silent as to whether he was homeless in January 2009 when he was scheduled for the consultative examination.  The last reference to his housing situation is at the hearing on December 1, 2008, when he was living in disabled housing.  Tr. 34.  If Ray intentionally failed to appear, then ALJ could properly question his motivation.  However, the record is unclear on that point.

With respect to Ray's alleged back related symptoms, the ALJ erred by finding them inconsistent with the medical record.  The ALJ concedes that the 2006 MRI supports Ray's complaints of back pain, but simply concludes, without further explanation, that it "is accounted for in finding that" he could perform "a limited range of light work, including occasional stopping and bending."  Tr. 16.  Absent some basis for drawing that conclusion, this is not a clear and convincing reason.  The ALJ also concedes that a 2003 evaluation supports Ray's complaints (Tr. 16-17, citing Exhibit 1F (Tr. 289)), but then refers to 2004

records which "indicated that [Ray] was able to move without apparent difficulty and that he had a normal gait" and subsequent medical records from 2005 and 2006 that "do not show evidence of significant worsening." Tr. 17. All of these cited medical records are the same ones used to reject FNP Heybach's opinion and, for the same reasons, do not support the ALJ's conclusion. The ALJ also refers to 2007 and 2008 medical records noting that although Ray "walked with an antalgic gait and that he used a cane, a medical provider did not prescribe the cane." *Id.* However, the lack of a prescription for a cane does not necessarily mean that Ray had no reason to use one. In sum, the ALJ does not cite any medical records that undermine Ray's testimony.

With respect to daily activities, the ALJ noted that Ray "is able to live alone, attend to self-care, including bathing and dressing, attend medical appointments, prepare simple meals, and do some household chores such as dishwashing and laundry. Also he is able to use public transportation and grocery shop weekly." *Id.* However, the ALJ must evaluate Ray's ability to work on a sustained and continuing basis. 20 CFR §§ 404.1512, 416.912. "The Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits." *Fair v. Bowen*, 885 F2d 597, 603 (9th Cir 1989). Many home activities may not easily be transferable to work setting, where it might be impossible to periodically rest or take medication. *Id.* "[I]f a claimant is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting, a specific finding as to this fact may be sufficient to discredit an allegation of disabling excess pain." *Id.*

The ALJ did not inquire, nor does the record reflect, what activities Ray can do on a sustained and continuing basis. Though he is capable of living on his own, he has been

homeless for periods of time (Tr. 44, 489, 495) and by the time of the hearing, lived in one-room apartment in a building for disabled individuals.  Tr. 34.  He prepares meals by using the microwave and requires a cart and assistance from friends to grocery shop.  Tr. 33-34, 36.  The ALJ did not consider that Ray performed his daily living activities sporadically, interspersed with rest, and at a slower pace than demanded by a competitive work environment.

The ALJ is correct in that Ray worked beyond the reported 2003 onset date.  However, he did not sustain full-time employment, suffered recurring pain while working, and stopped based upon medical advice.  Tr. 32, 57, 478.  He should not be penalized because he tried to work.

Thus, most of the ALJ's reasons to discredit Ray are not clear and convincing.  However, as long as the credibility determination remains supported by other valid reasons, it is harmless for the ALJ to also state invalid reasons.  *Carmickle v. Comm'r of Soc. Sec. Admin.,* 533 F3d 1155, 1162 (9th Cir. 2008).  The issue is whether substantial evidence supports the ALJ's decision such that the invalid reasons did not affect the ultimate conclusion.  *Batson v. Comm'r of Soc. Sec. Admin.,* 359 F3d 1190, 1197 (9th Cir 2004).

Here only one reasons given by the ALJ to discredit Ray, namely the lack of medical records to support his COPD symptoms, is supported by substantial evidence.  Thus, this court concludes that the ALJ erred by failing to give clear and convincing reasons to support her adverse credibility finding.

## IV.    Development of the Record

Ray contends that the ALJ erred by not fully developing the record obtain the testimony of a medical advisor.  When the agency does not have sufficient evidence to

determine if the claimant is disabled or cannot reach a conclusion that he is disabled, the

agency may request "additional existing records, recontact your treating sources or any

other examining sources, ask you to undergo a consultative examination at our expense, or

ask you or others for more information."  20 CFR §§ 404.1527(a)(1); 416.927(a)(1).  The

ALJ's duty to develop the record is triggered when the doctor's report is ambiguous or

insufficient to make a disability determination.  *Bayliss v. Barnhart*, 427 F3d 1211, 1217

(9th Cir 2005).

###### A.   <u>Consultative Exam</u>

"A consultative examination may be purchased when the evidence as a whole, both

medical and nonmedical, is not sufficient to support a decision on your claim."  20 CFR

§§ 404.1519a(b); 416.919a(b).  Five situations require a consultative examination:

> (1) The additional evidence needed is not contained in the records of
> your medical sources;
> (2) The evidence that may have been available from your treating or
> other medical sources cannot be obtained for reasons beyond your
> control, such as death or noncooperation of a medical source;
> (3) Highly technical or specialized medical evidence that we need is
> not available from your treating or other medical sources;
> (4) A conflict, inconsistency, ambiguity or insufficiency in the
> evidence must be resolved, and we are unable to do so by recontacting
> your medical source; or
> (5) There is an indication of a change in your condition that is likely to
> affect your ability to work, but the current severity of your impairment
> is not established.

*Id.*

Nothing in the record supports a consultative examination based on the latter four

situations.  Thus, only the first situation, a need to obtain additional evidence not contained

in the records of the medical sources, could arguably support the need for a consultative

examination.

27 - FINDINGS AND RECOMMENDATION

The Commissioner argues that neither Ray nor his attorney indicated prior to the decision that the record required additional development. In fact, when the ALJ asked at the hearing if the record was medically up to date, Ray's attorney confirmed it was. Tr. 25. Further, the ALJ left the record open for 30 days for Ray and his counsel to submit any additional evidence, which they did not. Tr. 74.

However, at the end of the hearing, the ALJ also said that she "may also send you to a [consultative examination]." Tr. 74. It was scheduled in January 2009, but Ray failed to appear and otherwise could not be reached. Tr. 717-18. This strongly suggests the ALJ believed the record required additional development and effectively refutes the Commissioner's argument that further development was unnecessary.

The Commissioner's argument that Ray failed to request further development of the record misapprehends the shared burden of proof in Social Security disability cases. While the claimant bears the burden of proof and must identify the evidence necessary for the Commissioner to make a disability determination, the Commissioner shares the burden of developing the record. 20 CFR §§ 404.704, 404.1512(a), 404.1513(e). *DeLorme v. Sullivan*, 924 F2d 841, 849 (9th Cir 1991). "The ALJ in a social security case has an independent 'duty to fully and fairly develop the record and to assure that the claimant's interests are considered.' This duty extends to the represented as well as to the unrepresented claimant." *Topanetyan v. Halter*, 242 F3d 1444, 1150 (9th Cir 2001) (citations omitted). Having determined that further development was necessary, the ALJ cannot rely on the claimant's failure to request further development to avoid her duty.

However, the ALJ clearly satisfied her duty to fully and fairly develop the record by requesting a consultative examination. Unfortunately, that examination was never held

28 - FINDINGS AND RECOMMENDATION

because Ray failed to appear.  Ray appears to argue that this failure is not his fault because he was homeless and could not be contacted.  However, as previously noted, the record is silent as to his housing situation at that time.  In addition, the record reveals that the examiner tried to contact Ray through his social worker at the Multnomah County Clinic without success. Tr. 718.  Under these confusing circumstances, this court is reluctant to conclude that the ALJ erred by failing to obtain a consultative examination.

**B.**    **Recontacting the Treating Source**

Ray argues that the ALJ erred in disregarding FNP Heybach's RFC because her comments and noted limitations "are inconsistent with examination findings" and "medical records do not support such a limited level of functioning." Tr. 18.  Ray argues that if there were inconsistencies, the proper course was to recontact FNP Heybach, rather than give her opinion less weight.

When the evidence received from the treating physician or other medical source is inadequate to determine whether claimant is disabled, the ALJ must obtain additional information to reach a determination when the medical source information contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques.   20 CFR §§ 404.1512(e); 416.912(e).

As previously discussed, the ALJ improperly rejected FNP Heybach's opinion because she deemed other medical records to be inconsistent with the proposed limitations. This is a case in which the ALJ simply did not agree, whether properly or not, with the treating source.  Thus, the ALJ did not err by failing to recontact FNP Heybach.

///

29 - FINDINGS AND RECOMMENDATION

**V.**    **Medical Expert Opinion on Medical Equivalence**

Ray argues that the ALJ erred by failing to obtain a medical expert opinion on medical equivalence at step three of the sequential evaluation process.  20 CFR §§ 404.526, 416.926.  He contends that he meets Listing 1.04 because of his pain symptoms and need for a cane.

The ALJ is not bound by a finding by a State agency medical consultant as to whether an individual's impairments are equivalent in severity to any impairment in the Listing of Impairments.  SSR 96-6p, 1996 WL 374180 (July 2, 1996), at *3.  "However, longstanding policy requires that the judgment of a physician . . . designated by the Commissioner on the issue of equivalence on the evidence before the administrative law judge or the Appeals Council must be received into the record as expert opinion evidence and given appropriate weight."  *Id*.  "The signature of a State agency medical . . . consultant on an SSA-831-U5 (Disability Determination and Transmittal Form) . . . ensures that consideration by a physician . . . designated by the Commissioner has been given to the question of medical equivalence at the initial and reconsideration levels of administrative review."  *Id.*

The record contains a Disability Determination and Transmittal form which is signed by both Drs. Kehrli and Jensen. Tr. 76-79.  Thus, the ALJ did not err at step three.

**VI.**    **RFC Determination**

Finally, Ray argues the ALJ erred in formulating his RFC.  To the extent that the ALJ failed to include all of Ray's limitations, Ray is correct.  The ALJ is not required to incorporate limitations which he finds unsupported by the record.  *Batson*, 359 F3d at 1197-98; *Osenbrock v. Apfel*, 240 F3d 1157, 1163-65 (9th Cir 2001); *Magallanes v. Bowen*, 881

30 - FINDINGS AND RECOMMENDATION

F2d 747, 756-57 (9th Cir 1989).  However, as discussed above, the ALJ failed to consider

considered all the evidence of Ray's functional limitations to reach his RFC assessment.

## VII.    **Remand**

The decision whether to remand for further proceedings or for immediate payment of

benefits is within the discretion of the court.  *Harman*, 211 F3d at 1178.  The issue turns on

the utility of further proceedings.  A remand for an award of benefits is appropriate when no

useful purpose would be served by further administrative proceedings or when the record

has been fully developed and the evidence is insufficient to support the Commissioner's

decision.  *Strauss v. Comm'r of Soc. Sec. Admin.*, 635 F3d 1135, 1138-39 (9th Cir 2011),

quoting *Benecke v. Barnhart*, 379 F3d 587, 593 (9th Cir 2004).  The court may not award

benefits punitively, and must conduct a "credit-as-true" analysis to determine if a claimant

is disabled under the Act.  *Id* at 1138.

Under the "crediting as true" doctrine, evidence should be credited and an immediate

award of benefits directed where "(1) the ALJ failed to provide legally sufficient reasons for

rejecting the evidence; (2) there are no outstanding issues that must be resolved before a

determination of disability can be made; and (3) it is clear from the record that the ALJ

would be required to find the claimant disabled were such evidence credited."  *Id.*  The

"crediting as true" doctrine is not a mandatory rule in the Ninth Circuit, but leaves the court

flexibility in determining whether to enter an award of benefits upon reversing the

Commissioner's decision.  *Connett v. Barnhart*, 340 F3d 871, 876 (9th Cir 2003), citing

*Bunnell*, 947 F2d at 348.  The reviewing court declines to credit testimony when

"outstanding issues" remain.  *Luna v. Astrue*, 623 F3d 1032, 1035 (9th Cir 2010).

As discussed above, the ALJ erred by failing to provide legally sufficient reasons for rejecting the opinion of FNP Heybach and discrediting Ray's testimony and the lay witness testimony. Thus, that evidence should be credited as true. *See Harman*, 211 F3d at 1179; *Smolen*, 80 F3d at 1281-83; *Varney*, 859 F2d at 1398.

Turning to the other two facets of the *Harman* inquiry, this court finds that no outstanding issues must be resolved before a determination of disability can be made and that it is clear from the record that the ALJ would be required to find Ray disabled if the evidence is credited.

Ray attorney asked the VE to consider an individual with limitations as provided by FNP Heybach. The VE concluded that a person with such limitations could not sustain competitive employment. Tr. 50. It is clear from the record that Ray is unable to perform gainful employment in the national economy. Because the evidence establishes that Ray would be unable to maintain employment, remand for further administrative proceedings serves no useful purpose and is unwarranted.

## **RECOMMENDATION**

For the reasons discussed above, the Commissioner's decision should be REVERSED and REMANDED for an award of benefits.

## **SCHEDULING ORDER**

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due Friday, April 06, 2012. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED March 20, 2012.


s/ Janice M. Stewart
Janice M. Stewart
United States Magistrate Judge